**THE PEOPLE'S LAW FIRM, PLC**
Stephen D. Benedetto (Ariz. Bar No. 022349)
Heather Hamel (Ariz. Bar No. 031734)
Will Knight (Ariz. Bar No. 030514)
645 North 4th Avenue, Suite A
Phoenix, Arizona 85003
Telephone: (602) 456-1901
Facsimile: (602) 801-2834
benedetto@the-plf.com
hamel@the-plf.com
knight@the-plf.com

*Firm email for docketing purposes:*
admin@the-plf.com

[Additional Counsel cont. from on second]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maxima Guerrero Sanchez; Talleah Alvarado; Alexander Anderson; Tierra Colter; Osama Daood; Corina Garcia; Shane Haisten; Anthony Harding; Jeanette Hunt; Latanja Jackson; Brandon LeMar; Erika Martin; Charlinda Martinez; Sierra McMartin; Marco Nevarez; Darric Newman; Corey Niass; Dylan Southworth; Jordan Thomas; Angela Tierney; Melodie Vanek; Ajani Williams; and Emmalee Zenko, individually and as class representatives, | Case No. **CLASS COMPLAINT IN CIVIL ACTION FOR DETERMINATION OF CLASS LIABILITY AND INJUNCTIVE RELIEF** **Fed. R. Civ. P. 38(b)(1) Notice of Demand for Trial by Jury** |
| Plaintiffs, | |
| vs. | |
| City of Phoenix, a municipal corporation; Jeri Williams; Dennis Orender; Douglas McBride; and Benjamin Moore, | |
| Defendants. | |

[Additional counsel cont. from first page]

**MURPHY, FALCON & MURPHY**
William Murphy, Jr. (*PHV to be filed*)
Malcolm Ruff (*PHV to be filed*)
1 South Street, Suite 3000
Baltimore, Maryland 21202
Telephone: (410) 539-6500
Facsimile: (410) 539-6599
Billy.Murphy@MurphyFalcon.com
Malcolm.Ruff@MurphyFalcon.com

**THE TRIAL LAW FIRM, LLC**
Mart Harris (*PHV to be filed*)
428 Forbes Avenue, Suite 1700
Pittsburgh, Pennsylvania 15219
Telephone: (412) 588-0030
Facsimile: (412) 265-6505
MH@TLawF.com

## CLASS COMPLAINT IN CIVIL ACTION FOR DETERMINATION OF CLASS LIABILITY AND FOR INJUNCTIVE RELIEF

NOW COMES the Plaintiffs on their individual behalf, and on behalf of the class of individuals that they seek to represent, by and through their lawyers, to file the within Class Complaint in Civil Action for a Determination of Class Liability and for Injunctive Relief, and in support thereof aver that:

### INTRODUCTION

History will remember May 25, 2020 as the day that Derek Chauvin of the Minneapolis Police Department murdered George Floyd, an unarmed Black man who was reported for having committed what can only be described as a petty crime: the use of a counterfeit $20.00 bill.  A much smaller part of the world—Phoenix, Arizona—will remember May 25, 2020 as the day that George Floyd was the *second* Black man murdered by the government on May 25, 2020… the first was Dion Johnson. Mr. Johnson was not reported for any crime whatsoever but was merely taking a nap in his immobilized vehicle on the Loop 101 as he waited for help.  When police arrived, he was thought to be severely intoxicated and non-responsive. For reasons that only they know for sure, officers in this jurisdiction shot Mr. Johnson to death.

When the video of Mr. Floyd's murder zoomed around the world by way of social media, the protests that were already brewing in Phoenix, Arizona were drowned out by citizens all over the county, indeed the world, against police brutality. While the world will remember Mr. Floyd, Mr. Johnson may be but a footnote in the history books. That footnote will include the story of the 124 people who were arrested for existing in downtown Phoenix, brutalized in the summer heat, and then illegally booked into jail. That footnote

will also include the story of the heroic initial appearance judges who immediately saw through the façade and, instead of setting bail, dismissed the trumped-up charges of "rioting." This lawsuit is the primordial soup of that footnote.

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff and proposed class representative Maxima Guerrero Sanchez is, and was at all relevant times, a resident of Maricopa County. Ms. Guerrero was in downtown Phoenix, Arizona on the evening of May 30, 2020 to associate with peaceful protesters, and provide them with fluids. Because she was in that location on that date and timeframe, she was arrested by the police, detained for hours in a poorly ventilated police vehicle without access to fluids or restroom facilities with numerous strangers, and sent to jail for "felony rioting." In the course of her arrest, she was threatened by the police, who caused her to be in fear for her own physical safety. The probable cause statement used to justify her arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including but not exclusively limited to the police statement reproduced *infra*, the Defendants conspired to falsely charge felony offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected First Amendment activities. All 124 individuals had their criminal cases dismissed at their Initial Appearances. Despite the immediate dismissal of criminal charges, Ms. Guerrero was forced into immigration proceedings.

2. Plaintiff and proposed class representative Talleah Alvarado is, and was at all relevant times, a resident of Maricopa County. Ms. Alvarado was in downtown Phoenix, Arizona on the evening of May 30, 2020 to express her opposition to the police

murders of George Floyd and Dion Johnson, and to express her support for the Movement for Black Lives. Because she was in that location on that date and timeframe, she was subject to indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, and inhaled said chemical agents thereby being subjected to pain. As a direct and proximate result of the actions of police, including but not limited to their indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, Ms. Alvarado's willingness to continue engaging in her First Amendment activities was extinguished, and she decided to leave the area. She was then arrested by the police and sent to jail for "felony rioting." In the course of her arrest, she was threatened by the police, shot at with rubber bullets that caused damage to her personal property, and caused her to be in fear for her own physical safety. The probable cause statement used to justify her arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including but not exclusively limited to the police statement reproduced *infra*, the Defendants conspired to falsely charge felony offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected First Amendment activities. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

3.     Plaintiff and proposed class representative Alexander Anderson is, and was at all relevant times, a resident of Maricopa County.  Mr. Anderson was in downtown Phoenix, Arizona on the evening of May 30, 2020 to express his support for the Movement for Black Lives. Because he was in that location on that date and timeframe, he witnessed the indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber

bullets. As a direct and proximate result of the actions of police, including but not limited to their indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, Mr. Anderson's willingness to continue engaging in his First Amendment activities was extinguished, and he decided to leave the area. He was then arrested by the police and sent to jail for "felony rioting." In the course of his arrest, he was threatened by the police, shot at with rubber bullets that caused damage to his personal property, and caused him to be in fear for his own physical safety. The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including but not exclusively limited to the police statement reproduced *infra*, the Defendants conspired to falsely charge felony offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected First Amendment activities. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

4.      Plaintiff and proposed class representative Tierra Colter is, and was at all relevant times, a resident of Maricopa County.  Ms. Colter was in downtown Phoenix, Arizona on the evening of May 30, 2020 to criticize police violence. Because she was in that location on that date and timeframe, she was subjected to indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, and inhaled said chemical agents thereby being subjected to pain. As a direct and proximate result of the actions of police, including but not limited to their indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, Ms. Colter's willingness to continue engaging in her First Amendment activities was extinguished, and she decided to leave the

area. She was then arrested by the police, detained for hours in a poorly ventilated police vehicle without access to fluids or restroom facilities, with numerous strangers, and sent to jail for "felony rioting." In the course of her arrest, she was threatened by the police, who caused her to be in fear for her own physical safety. The probable cause statement used to justify her arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including but not exclusively limited to the police statement reproduced *infra*, the Defendants conspired to falsely charge felony offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected First Amendment activities. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

5.     Plaintiff and proposed class representative Osama Daood is, and was at all relevant times, a resident of Maricopa County. Mr. Daood was in downtown Phoenix, Arizona on the evening of May 30, 2020 to observe those who were expressing their opposition to the police murders of George Floyd and Dion Johnson. As a direct and proximate result of the actions of police, including but not limited to their indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, Mr. Daood's willingness to continue engaging in his First Amendment activities was extinguished, and he decided to leave the area. Because he was in that location on that date and timeframe, he was arrested by the police and sent to jail for "felony rioting." The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including but not exclusively limited to the

1    police statement reproduced *infra*, the Defendants conspired to falsely charge felony

2    offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or

3    suspected First Amendment activities. All 124 individuals had their criminal cases

4    dismissed at their Initial Appearances.

5         6.      Plaintiff and proposed class representative Corina Garcia is, and was at all

6    relevant times, a resident of Maricopa County.  Ms. Garcia was in downtown Phoenix,

7    Arizona on the evening of May 30, 2020 for supper. Because she was in that location on

8    that date and timeframe, she was arrested by the police, detained for hours in a poorly

9    ventilated police vehicle without access to fluids or restroom facilities, with numerous

10   strangers, and sent to jail for "felony rioting." In the course of her arrest, she was threatened

11   by the police, who caused her to be in fear for her own physical safety.  Upon information

12   and belief, the police actions described herein directly and proximately caused the

13   involuntary and spontaneous abortion of her child. The probable cause statement used to

14   justify her arrest was the same cut-and-paste probable cause statement used against 123

15   other individuals who were in downtown Phoenix, Arizona on the evening of May 30,

16   2020. Upon information and belief, including but not exclusively limited to the police

17   statement reproduced *infra*, the Defendants conspired to falsely charge felony offenses

18   against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected

19   First Amendment activities. All 124 individuals had their criminal cases dismissed at their

20   Initial Appearances.

21        7.      Plaintiff and proposed class representative Shane Haisten is, and was at all

22   relevant times, a resident of Maricopa County. Mr. Haisten was in downtown Phoenix,

23   Arizona on the evening of May 30, 2020 to express his opposition to the police murders of

George Floyd and Dion Johnson. As a direct and proximate result of the actions of police, including but not limited to their indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, Mr. Haisten's willingness to continue engaging in his First Amendment activities was extinguished, and he decided to leave the area. Because he was in that location on that date and timeframe, he was arrested by the police and sent to jail for "felony rioting." In the course of his arrest, police stated that they would be unable to hold any of the arrested persons in custody unless they were all charged with a felony offense. The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including but not exclusively limited to the police statement reproduced *infra*, the Defendants conspired to falsely charge felony offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected First Amendment activities. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

8.     Plaintiff and proposed class representative Dylan Southworth is, and was at all relevant times, a resident of Maricopa County. Mr. Southworth was in downtown Phoenix, Arizona on the evening of May 30, 2020 to express his opposition to the police murders of George Floyd and Dion Johnson. As a direct and proximate result of the actions of police, including but not limited to their indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, Mr. Southworth's willingness to continue engaging in his First Amendment activities was extinguished, and he decided to leave the area. Because he was in that location on that date and timeframe, he was arrested by the police and sent to jail for "felony rioting." In the course of his arrest, police stated that they

would be unable to hold any of the arrested persons in custody unless they were all charged with a felony offense. The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including but not exclusively limited to the police statement reproduced *infra*, the Defendants conspired to falsely charge felony offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected First Amendment activities. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

9.      Plaintiff and proposed class representative Anthony Harding is, and was at all relevant times, a resident of Maricopa County.  Mr. Harding was in downtown Phoenix, Arizona on the evening of May 30, 2020 to express his support for the Movement for Black Lives. Because he was in that location on that date and timeframe, he was subjected to indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, and was struck by a tear gas canister which burned his body thereby subjecting him to pain and he was arrested by the police and sent to jail for "felony rioting." In the course of his arrest, Defendant Officer Who Arrested Harding kneeled on Harding's back directly and proximately causing additional physical pain. The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including but not exclusively limited to the police statement reproduced *infra*, the Defendants conspired to falsely charge felony offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected First Amendment activities. All 124 individuals had their criminal cases dismissed at their Initial

1  Appearances.

2      10.    Plaintiff and proposed class representative Jeanette Hunt is, and was at all

3  relevant times, a resident of Maricopa County.  Ms. Hunt was in downtown Phoenix,

4  Arizona on the evening of May 30, 2020 to drive friends home. Because she was in that

5  location on that date and timeframe, she was arrested by the police, detained for hours in a

6  poorly ventilated police vehicle without access to fluids or restroom facilities with

7  numerous strangers, and sent to jail for "felony rioting." In the course of her arrest, she was

8  threatened by the police, who caused her to be in fear for her own physical safety. The

9  probable cause statement used to justify her arrest was the same cut-and-paste probable

10  cause statement used against 123 other individuals who were in downtown Phoenix,

11  Arizona on the evening of May 30, 2020. All 124 individuals had their criminal cases

12  dismissed at their Initial Appearances.

13      11.    Plaintiff and proposed class representative Latanjra Jackson is, and was at all

14  relevant times, a resident of Maricopa County.  Ms. Jackson was in downtown Phoenix,

15  Arizona on the evening of May 30, 2020 to drive friends home. Because she was in that

16  location on that date and timeframe, she was arrested by the police, detained for hours in a

17  poorly ventilated police vehicle without access to fluids or restroom facilities with

18  numerous strangers, and sent to jail for "felony rioting." In the course of her arrest, she was

19  threatened by the police, who caused her to be in fear for her own physical safety. The

20  probable cause statement used to justify her arrest was the same cut-and-paste probable

21  cause statement used against 123 other individuals who were in downtown Phoenix,

22  Arizona on the evening of May 30, 2020. All 124 individuals had their criminal cases

23  dismissed at their Initial Appearances.

12.     Plaintiff and proposed class representative Brandon LeMar is, and was at all relevant times, a resident of Maricopa County.  Mr. LeMar was in downtown Phoenix, Arizona on the evening of May 30, 2020 to drive someone home. Because he was in that location on that date and timeframe, he was arrested by the police and sent to jail for "felony rioting." In the course of his arrest, he was threatened by the police, who caused him to be in fear for his own physical safety. The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

13.     Plaintiff and proposed class representative Erika Martin is, and was at all relevant times, a resident of Maricopa County.  Ms. Martin was in downtown Phoenix, Arizona on the evening of May 30, 2020 to drive someone home. Because she was in that location on that date and timeframe, she was arrested by the police and sent to jail for "felony rioting." In the course of her arrest, she was threatened by the police, who caused her to be in fear for her own physical safety. The probable cause statement used to justify her arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

14.     Plaintiff and proposed class representative Charlinda Martinez is, and was at all relevant times, a resident of Maricopa County.  Ms. Martinez was in downtown Phoenix, Arizona on the evening of May 30, 2020 to observe those who were expressing their opposition to the police murders of George Floyd and Dion Johnson. Because she was in that location on that date and timeframe, she was arrested by the police, detained for hours

in a poorly ventilated police vehicle without access to fluids or restroom facilities with numerous strangers, and sent to jail for "felony rioting." In the course of her arrest, she was threatened by the police, who caused her to be in fear for her own physical safety. The probable cause statement used to justify her arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

15.     Plaintiff and proposed class representative Sierra McMartin is, and was at all relevant times, a resident of Maricopa County.  Ms. McMartin was in downtown Phoenix, Arizona on the evening of May 30, 2020 to express her opposition to the police murders of George Floyd and Dion Johnson. Because she was in that location on that date and timeframe, she was subject to indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, and inhaled said chemical agents thereby being subjected to pain. As a direct and proximate result of the actions of police, including but not limited to their indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, Ms. McMartin's willingness to continue engaging in her First Amendment activities was extinguished, and she decided to leave the area. She was then arrested by the police, detained for hours in a poorly ventilated police vehicle without access to fluids or restroom facilities with numerous strangers, and sent to jail for "felony rioting." In the course of her arrest, police stated that "Jeri Williams" made the decision to arrest her. The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including

but not exclusively limited to the police statement reproduced *infra*, the Defendants conspired and/or Jeri Williams ordered the police to arrest everyone in the area and falsely charge felony offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected First Amendment activities. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

16.    Plaintiff and proposed class representative Emmalee Zenko is, and was at all relevant times, a resident of Maricopa County.  Ms. Zenko was in downtown Phoenix, Arizona on the evening of May 30, 2020 to express her opposition to the police murders of George Floyd and Dion Johnson. Because she was in that location on that date and timeframe, she was subject to indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, and inhaled said chemical agents thereby being subjected to pain. As a direct and proximate result of the actions of police, including but not limited to their indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, Ms. Zenko's willingness to continue engaging in her First Amendment activities was extinguished, and she decided to leave the area. She was then arrested by the police, detained for hours in a poorly ventilated police vehicle without access to fluids or restroom facilities with numerous strangers, and sent to jail for "felony rioting." The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

17.    Plaintiff and proposed class representative Marco Nevarez is, and was at all relevant times, a resident of Maricopa County.  Mr. Nevarez was in downtown Phoenix,

Arizona on the evening of May 30, 2020 to express his opposition to the police murders of George Floyd and Dion Johnson and to observe law enforcement. Because he was in that location on that date and timeframe, he was arrested by the police and sent to jail for "felony rioting." The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

18.     Plaintiff and proposed class representative Darric Newman is, and was at all relevant times, a resident of Maricopa County.  Mr. Newman was in downtown Phoenix, Arizona on the evening of May 30, 2020 to observe those who were expressing their opposition to the police murders of George Floyd and Dion Johnson. Because he was in that location on that date and timeframe, he was arrested by the police and sent to jail for "felony rioting." In the course of his arrest, he was shot by Defendant Officer Who Shot Newman in the knee with a rubber bullet. At no time did Newman make any aggressive movement towards or otherwise fail to comply with any police order. The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

19.     Plaintiff and proposed class representative Corey Niass is, and was at all relevant times, a resident of Maricopa County. Mr. Niass was in downtown Phoenix, Arizona on the evening of May 30, 2020 to express his opposition to the police murders of George Floyd and Dion Johnson and to observe law enforcement and to express his support

for the Movement for Black Lives. Because he was in that location on that date and timeframe, he witnessed the indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets. As a direct and proximate result of the actions of police, including but not limited to their indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets, Mr. Niass' willingness to continue engaging in his First Amendment activities was extinguished, and he decided to leave the area. He was then arrested by the police and sent to jail for "felony rioting." In the course of his arrest, he was threatened by the police, shot at with rubber bullets that caused damage to his personal property, and caused him to be in fear for her own physical safety. The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including but not exclusively limited to the police statement reproduced *infra*, the Defendants conspired to falsely charge felony offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected First Amendment activities. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

20.     Plaintiff and proposed class representative Jordan Thomas is, and was at all relevant times, a resident of Maricopa County.  Mr. Thomas was in downtown Phoenix, Arizona on the evening of May 30, 2020 to express his opposition to police violence. Because he was in that location on that date and timeframe, and chanting "hands up don't shoot," Defendant Officer who Shot Thomas shot Thomas in the ribs, while Thomas was kneeling, with a rubber bullet causing him physical pain. As a direct and proximate result of the actions of police, including but not limited to their indiscriminate use of tear gas

and/or pepper spray and/or pepper balls and/or rubber bullets, Mr. Thomas' willingness to continue engaging in his First Amendment activities was extinguished, and he decided to leave the area. He was then arrested by the police, detained for hours in a poorly ventilated police vehicle without access to fluids or restroom facilities with numerous strangers, and sent to jail for "felony rioting." The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including but not exclusively limited to the police statement reproduced *infra*, the Defendants conspired to falsely charge felony offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected First Amendment activities. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

21.     Plaintiff and proposed class representative Angela Tierney is, and was at all relevant times, a resident of Maricopa County.  Ms. Tierney was in downtown Phoenix, Arizona on the evening of May 30, 2020 to express her opposition to the police murders of George Floyd and Dion Johnson and to express her support for the Movement for Black Lives. Because she was in that location on that date and timeframe, she was subjected to the indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets. She breathed in the weapons which caused her physical pain. She was then arrested by the police, detained for hours in a poorly ventilated police vehicle without access to fluids or restroom facilities with numerous strangers, and sent to jail for "felony rioting." In the course of her arrest, she was threatened by the police which caused her to be in fear for her own physical safety. The probable cause statement used to justify her arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were

in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including but not exclusively limited to the police statement reproduced *infra*, the Defendants conspired to falsely charge felony offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected First Amendment activities. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

22.     Plaintiff and proposed class representative Melanie Vanek is, and was at all relevant times, a resident of Maricopa County.  Ms. Vanek was in downtown Phoenix, Arizona on the evening of May 30, 2020 to express her desires for racial justice. Because she was in that location on that date and timeframe, she was subjected to the indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets. She breathed in the weapons which caused her physical pain. She was then arrested by the police, detained for hours in a poorly ventilated police vehicle without access to fluids or restroom facilities with numerous strangers, and sent to jail for "felony rioting." The probable cause statement used to justify her arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. Upon information and belief, including but not exclusively limited to the police statement reproduced *infra*, the Defendants conspired to falsely charge felony offenses against the Plaintiffs with the specific purpose of suppressing their actual and/or suspected First Amendment activities. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

23.     Plaintiff and proposed class representative Ajani Williams is, and was at all relevant times, a resident of Maricopa County.  Mr. Williams was in downtown Phoenix, Arizona on the evening of May 30, 2020 to observe those expressing their opposition to

the police murders of George Floyd and Dion Johnson. Because he was in that location on that date and timeframe, he was then arrested by the police and sent to jail for "felony rioting." The probable cause statement used to justify his arrest was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. All 124 individuals had their criminal cases dismissed at their Initial Appearances.

24.     Defendant City of Phoenix (the "City") is a municipal corporation created, organized, and existing under the laws of the State of Arizona.  The City is under a duty to run its law enforcement activities in a lawful manner to preserve the peace and to preserve for its citizens the rights, privileges, and immunities guaranteed and secured to them by the Constitutions and laws of the United States and the State of Arizona. The Phoenix police Department ("PPD") is an agency of the City, and all actions of the PPD are the legal responsibility of the City because the City has delegated its law enforcement duties and responsibilities to PPD, including but not limited to the responsibility of establishing and implementing policies, practices, procedures and/or customs used by law enforcement officers employed by the City regarding the investigation, detention, arrest, and public relations during law enforcement operations.

25.     Defendant Jeri L. Williams ("Chief Williams") is, and was at all relevant times, the Chief of Police for the City of Phoenix Police Department.  As such, Chief Williams is the final policymaker for the City in the area of law enforcement and in setting and implementing the policies and practices of PPD, including but not limited to:

a.  the development, implementation, and the training of PPD personnel in the areas of proper use of force;

    b.  the need for proper warnings in response to political protests and public demonstrations and marches;

    c.  lawful arrests;

    d.  the development and implementation of policies concerning protests and the protection of participants' basic rights of speech and association, and for making these policies known to all PPD personnel;

    e.  ensuring that all members of the PPD were adequately and consistently trained in their meaning and implementation, as well as in all relevant constitutional requirements and police best practices;

    f.  the training and preparation of PPD personnel with respect to the events of May 30, 2020 (wherein, she approved and/or ratified PPD's plans for that event—including the plans to conduct unlawful mass arrests of demonstrators using the same, cut-and-paste probable cause statement to support those arrests).

26.    As set out below, Chief Williams also failed to establish sufficient guidelines and regulations governing the PPD on May 30, 2020, and did not ensure adequate training before the event, nor did she properly supervise and monitor the actions of PPD personnel during the protest.  Upon information and belief, she has failed to discipline a single officer for the mass false arrests that took place on May 30, 2020, and instead, made multiple public statements praising her officers' conduct during the course of that protest fully ratifying the conduct of PPD related to this lawsuit, on behalf of the City.  Plaintiffs sue Chief Williams in her official and individual capacity.

27.     Defendant Benjamin Moore is a Lieutenant for the City of Phoenix Police Department, and is the "Field Force Commander" for PPD's Tactical Response Unit ("TRU").   Upon information and belief, Lt. Moore authorized the indiscriminate use of force against largely non-violent demonstrators, despite knowing that deploying indiscriminate force is unconstitutional, including the use of tear gas, pepper spray, and rubber bullets.  Upon information and belief, Lt. Moore either gave the order, approved, or knowingly ratified PPD's plans for arrests at the May 30, 2020 protest—including but not exclusively limited to the plans to apprehend demonstrators en masse using the same, cut-and-paste probable cause statements to support their false arrests.  Plaintiffs sue Lt. Moore in his individual capacity.

28.     Defendant Douglas McBride is a Sergeant with the City of Phoenix Police Department.   On May 30, 2020, he was responsible for supervising PPD's Tactical Response Unit.  Upon information and belief, Sgt. McBride authorized the indiscriminate use of force against non-violent demonstrators despite knowing that deploying indiscriminate force is unconstitutional, including the use of tear gas, pepper spray, and rubber bullets.   Upon information and belief, Sergeant McBride either gave the order, approved, or ratified PPD's plans for arrests at the May 30, 2020 protest—including the plans to apprehend demonstrators en masse using the same, cut-and-paste probable cause statements to support their false arrests.  Plaintiffs sue Sergeant Mc Bride in his individual capacity.

29.     Defendant Dennis Orender is a Commander for the City of Phoenix Police Department. Commander Orender is a leader within PPD's Tactical Response Unit, and upon information and belief, "calls the shots" on when to make arrests and of whom.  Upon

information and belief, Commander Orender either gave the order, approved, or ratified PPD's plans for arrests at the May 30, 2020 protest—including the plans to apprehend demonstrators en masse using the same, cut-and-paste probable cause statements to support their false arrests.  Plaintiffs sue Commander Orender in his individual capacity.

30.    Upon information and belief, there are currently unknown City of Phoenix employees who caused or contributed to Plaintiffs' injuries.  The identity and roles of these individuals are uniquely within the possession of the City of Phoenix and Plaintiffs will amend this complaint to add such responsible individuals upon discovery of their identities. Until such point, some of said individual officers have been named by way of a description of unique actions taken on May 30, 2020.

31.    Each of the above-mentioned individual Defendants participated in and has responsibility for the unlawful conduct that resulted in injuries to Plaintiffs and putative damages class members described herein, by, among other things, personally participating in the unlawful conduct, acting jointly or conspiring with others who did so; authorizing, acquiescing in, or setting in motion policies, plans, or actions that led to the unlawful conduct; failing to take action to prevent such unlawful conduct; failing to maintain adequate training and supervision in deliberate indifference to Plaintiffs' rights; and ratifying unlawful conduct that occurred by agents and officers under their direction, supervision, and control, including failing to take remedial or disciplinary action.

32.    Every act and omission of the employees, representatives, and agents of the Defendants detailed in this Complaint was performed under the color and pretense of the Constitutions, statutes, ordinances, regulations, customs, and uses of the United States of America, the State of Arizona, and the City of Phoenix, by their authority as sworn officers,

1   and within the course and scope of their employment.

2   33.   Plaintiffs bring this lawsuit to redress violations of, *inter alia*, 42 U.S.C. §

3   1983. Thereby this court has federal question jurisdiction pursuant to 28 U.S.C. § 1331,

4   and supplemental jurisdiction under 28 U.S.C. § 1367(a).

5   34.   The events and omissions which give rise to the claims asserted in this

6   lawsuit occurred in the geographical territory of this court, in Phoenix, Arizona. Therefore,

7   pursuant to 28 U.S.C. § 1391(b), this district court is the proper venue for this lawsuit.

8   35.   Defendants reside and do business in Maricopa County, Arizona. Therefore,

9   this court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4.

10   36.   Plaintiffs have satisfied all necessary conditions precedent to the filing of this

11   lawsuit.

12   **GENERAL ALLEGATIONS**
    *Historical Background of the Phoenix Police Department and Their*
13   *Continued Uses of Excessive Force*

14   37.   All other paragraphs of this lawsuit are incorporated.

15   38.   In 2010, PPD officers violently—and without provocation, justification, or

16   warning—shot pepper-spray at peaceful protesters marching for immigration reform. At

17   that time, PPD knew or should have known that such a violent response to peaceful exercise

18   of First Amendment rights was illegal and unconstitutional. The City was aware of PPD's

19   actions shortly after they occurred, yet took no steps to discipline, supervise, train, or

20   otherwise control PPD to ensure that such actions did not repeat in the future.

21   39.   In October 2014, at a demonstration in downtown Phoenix to protest police

22   brutality after a PPD officer's murder of Rumain Brisbon, PPD officers indiscriminately

23   and without warning fired pepper bullets at peaceful protesters. At that time, PPD knew or

should have known that such a violent response to peaceful exercise of First Amendment rights was illegal and unconstitutional. The City was aware of PPD's actions shortly after they occurred, yet took no steps to discipline, supervise, train, or otherwise control PPD to ensure that such actions did not repeat in the future.

40.     On or about July 8, 2016, Phoenix PD shot chemical weapons, including tear gas and pepper spray, into a crowd of thousands of Black Lives Matter peaceful protesters, demonstrating for racial justice after two viral videos showed the grisly murders of Alton Sterling and Philando Castile at the hands of the police.  Phoenix PD did so without providing any warnings to protesters before firing these weapons. And at the time that Phoenix PD shot projectiles into a crowd of thousands, many of the protesters had their hands up, in a classic surrender position, chanting "hands up, don't shoot!"[1]  PPD claimed to have deployed these chemical weapons as a "crowd-control measure." At that time, PPD knew or should have known that such a violent response to peaceful exercise of First Amendment rights was illegal and unconstitutional. The City was aware of PPD's actions shortly after they occurred, yet took no steps to discipline, supervise, train, or otherwise control PPD to ensure that such actions did not repeat in the future.

41.     Almost one year later, on the night of August 22, 2017, a force of approximately 900 Phoenix PD officers conducted an unannounced attack on a group of peaceful protesters, gathered to demonstrate strong disagreement with President Trump. During the course of this assault, Phoenix PD fired more than 590 kinetic and chemical projectiles into a crowd that included young children, pregnant women, disabled people,

---

[1] https://abcnews.go.com/US/phoenix-police-tear-gas-pepper-spray-black-lives/story?id=40453514

and elderly individuals. The American Civil Liberties Union filed a class action lawsuit shortly after that event, alleging that Phoenix PD had initiated such an attack without providing a warning to disperse to protesters.[2] At that time, PPD knew or should have known that such a violent response to peaceful exercise of First Amendment rights was illegal and unconstitutional. The City was aware of PPD's actions shortly after they occurred, yet took no steps to discipline, supervise, train, or otherwise control PPD to ensure that such actions did not repeat in the future.

42.   On July 12, 2019, Phoenix PD unlawfully arrested and maliciously prosecuted three well-known activists who were protesting against racial injustice and the ill-treatment of immigrants at the U.S. Border.  Among those arrested was criminal defense attorney and Black Lives Matter organizer, Jamaar Williams.[3] At that time, PPD knew or should have known that maliciously prosecuting demonstrators in response to the peaceful exercise of First Amendment rights was illegal and unconstitutional. The City was aware of PPD's actions shortly after they occurred, yet took no steps to discipline, supervise, train, or otherwise control PPD to ensure that such actions did not repeat in the future.

43.   Phoenix PD's response to the most recent slate of protests demonstrates that Phoenix PD has done little to nothing to change the ways in which it manages protests and protects individuals' constitutional rights.[4]  And it has demonstrated that it cares little for how its excessive force may contribute to the spread of a potentially deadly virus in the middle of a global pandemic.

---

[2] *See Puente v. City of Phoenix, et al.*, Case No. 2:18-cv-02778-JJT (Ariz. D. Ct. 2018).
[3] *See Williams v. City of Phoenix, et al.*, Case No. 2:20-cv-01367-PHX-SMB (Ariz. D. Ct. 2020).

[4] https://www.abc15.com/news/local-news/investigations/protest-arrests

1            ***COVID-19 greatly increases the danger of the Defendants' actions***

2            44.     All other paragraphs of this lawsuit are incorporated.

3            45.     The first cases of Coronavirus Disease 2019 ("COVID-19") were discovered

4     in Wuhan, China in December 2019.[5]  Although much was unknown about the virus when

5     it was first discovered, it was soon revealed to be a highly contagious respiratory virus

6     spread mainly person-to-person, "through respiratory droplets produced when an infected

7     person coughs, sneezes, or talks."[6]

8            46.     In the months after its discovery in December 2019, the COVID-19 virus

9     spread to every country in the world and infected millions of people.

10           47.     In Arizona, confirmed cases of COVID-19 have increased at an alarming and

11    record-setting pace, making it the world's epicenter for the spread of this potentially deadly

12    virus by the summer of 2020.[7]  At the end of April, Arizona had approximately 6,000

13    confirmed cases in the entire state.  But by mid-July, Arizona saw its confirmed new cases

14    of coronavirus grow by the thousands each day.[8]

15           48.     It was in this context that Phoenix PD made the decision to use chemical

16    weapons—which cause individuals to expel respiratory droplets—on crowds of non-

17    violent protesters; planned the illegal mass arrests of demonstrators and others; and decided

18    to holding them in unventilated transport vehicles before booking them into jail cells where

19

20           [5] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7121484/
             [6] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html
21           [7] https://www.nytimes.com/2020/07/08/briefing/arizona-mary-trump-facebook-your-
      wednesday-briefing.html; https://www.azcentral.com/story/opinion/op-
22    ed/laurieroberts/2020/07/08/arizona-now-no-1-world-coronavirus-but-some-arizonans-
      say-its-no-big-deal/5399638002/
23           [8]https://tucson.com/news/local/arizona-coronavirus-cases-mapped-by-county-april-
      22/article_c236eac-84e2-11ea-84e7-a76949d0b7c9.html.

1    these individuals were unable to socially distance or wear facial coverings.

2    ***Phoenix mourns the lives of Mr. Johnson and Mr. Floyd***

3    49.   All other paragraphs of this lawsuit are incorporated.

4    50.   On Thursday, May 28, 2020, thousands of peaceful protestors gathered in

5    downtown Phoenix to express their opposition to the police murders of both George Floyd

6    and Dion Johnson.  These protesters joined millions of other Americans across the country

7    who took to the streets to demand an end to racist police killings and practices.  Many of

8    these individuals were participating in demonstrating for the first time.

9    51.   Phoenix PD officers were present from the beginning of the peaceful protest,

10   greatly armored in riot gear and wielding heavy weaponry including:   Pepper bullets;

11   cannisters containing "CS" or tear gas; pepper-spray; mace; 40 mm foam impact rounds,

12   which travel at speeds up to 89 miles per hour and contained both "CS" and cayenne pepper

13   to deliver both blunt trauma as well as the effects of a chemical irritant; smoke grenades

14   (explosive devises that release an irritant); rubber-coated bullets; beanbag rounds (small

15   fabric bags filled with lead shot); and sound weapons like flash-bang grenades.

16   52.   These munitions are designed to incapacitate subjects, and to inflict large

17   amounts of pain to compel compliance.  The chemical weapons, in particular, are designed

18   to irritate the skin and mucosal areas (the eyes, nose, and throat) and force individuals to

19   cough and sneeze in response.

20   53.   The chemical irritants in these weapons also "stick" to fabric and will

21   contaminate a mask once a user comes into contact with these irritants.  In other words, if

22   an individual wearing a mask is exposed to these chemical irritants, they will be forced to

23   remove the mask.

54.     After several hours, Phoenix Police, unprovoked and without cause, declared the First Amendment assembly to be "unlawful" and immediately began shooting the protestors with pepper balls, pepper-spray, tear gas, and rubber-coated bullets to disburse the crowd.  Despite being subject to the deployment of chemical weapons banned for warfare by the Geneva Conventions,[9] no violence was threatened, no participants injured any police offices and all but eight (8) people voluntarily and peacefully left the area. Those eight people were arrested and charged with misdemeanor unlawful assembly.[10]

55.     On Friday, May 29, 2020, protestors returned to downtown Phoenix. Again, the protests carried on peacefully for hours. Nonetheless, Phoenix Police, once again, declared an unlawful assembly and again began using chemical and kinetic weapons against demonstrators in an attempt to disperse, disrupt, and stop the protests.

56.     Phoenix PD deployed these weapons without provocation and did so indiscriminately, exposing hundreds in the crowd to these harmful chemicals.  As soon as individuals were exposed to these chemicals, they had to either remove their masks and cough and sneeze violently on one another or suffocate.

57.     One man in the crowd immediately went into respiratory distress and volunteer medics on site began performing CPR on him.  Absurdly, Phoenix PD continued to shoot pepper balls and tear gas at both the man, and the medics performing CPR on him. Multiple times the medics had to cease performing CPR, and move this man's immobile body a few feet away from an oncoming Phoenix PD riot line, before resuming the

---

[9] https://www.usatoday.com/story/news/factcheck/2020/06/06/fact-check-its-true-tear-gas-chemical-weapon-banned-war/3156448001/
[10] https://www.abc15.com/news/national/rally-underway-in-phoenix-over-the-in-custody-death-of-george-floyd-in-minneapolis

performance of life-saving medical care.  This man was eventually transported by a group of strangers attending the protest, away from the scene and taken to the hospital.

58.     On the morning of Saturday, May 30, 2020, Phoenix Mayor Kate Gallego and Police Chief Jeri Williams held a press conference at which they announced that the protests the night before were largely peaceful; that there was a "small" group of protestors who had caused damage; and that the actions of a "few" had resulted in widespread property damage in the hundreds of thousands of dollars.[11]  Phoenix PD made two arrests that night (May 29, 2020).[12]

59.     Despite only making two arrests, Chief Williams warned demonstrators at a news conference held on the morning of May 30, 2020 that the behavior from May 29, 2020 would "not be tolerated" by Phoenix PD.

### *This Lawsuit*

60.     All other paragraphs of this lawsuit are incorporated.

61.     On Saturday, May 30, 2020, protestors again returned to downtown Phoenix. History repeated itself for the third consecutive night:  Peaceful protests were declared unlawful without cause, immediately and/or without a reasonable time to comply with orders to disperse followed by mass, indiscriminate deployments of tear gas, pepper spray, pepper balls, rubber-coated bullets, and beanbag rounds into a crowd of hundreds of non-violent protesters.  This night, however, Phoenix Police decided to change their tactics: Rather than permitting the protestors to disperse, they chased them down.

---

[11] https://www.facebook.com/watch/?v=752671345475649
[12] https://www.abc15.com/news/region-phoenix-metro/central-phoenix/watch-rallies-continue-friday-night-in-phoenix-over-deaths-of-dion-johnson-and-george-floyd

62.     That night, police rounded up and arrested 124 people just for being in downtown Phoenix. Many of these people were held for hours in poorly/unventilated transport vehicles without access to water or restrooms. It was impossible to socially distance in these vans, and many of the individuals had either been forced to remove their masks (due to chemical contamination) or had their masks confiscated by Phoenix PD officers.

63.     Those 124 people were also forced to spend time in jail, crammed into rooms with dozens of unmasked individuals, exposing them (and, in turn, the community at large) to COVID-19.  Those 124 individuals were all charged with felony rioting, and the "cut-and-paste" probable cause statements, as set forth below, were all thrown out by the initial appearance judges. These 124 individuals make up the class for this lawsuit.

**PROBABLE CAUSE STATEMENT**

1.   Please summarize and include the facts which establish probable cause for the arrest:

ON 053020 AT APPROXIMATELY 1730 HOURS A LARGE GROUP OF SUBJECTS GATHERED IN THE DOWNTOWN AREA TO PROTEST RECENT POLICE INVOLVED SHOOTINGS IN THE UNITED STATES. THE CROWD INITIALLY MOVED THROUGHOUT THE DOWNTOWN AREA PEACEFULLY. AT APPROXIMATELY 2056 HOURS LIEUTENANT MOORE 6803 GAVE A VERBAL WARNING TO THE CROWD TO DISPERSE/LEAVE THE ROADWAY/COMPLY WITH A LAWFUL ORDER OVER THE LONG RANGE ACOUSTIC DEVICE LRAD AFTER THE CROWD HAD MOVED INTO ROADWAYS OB-STRUCTING THE FLOW OF TRAFFIC AND AFTER GATHERING AT THE NORTH ENTRANCE TO POLICE HEADQUARTERS, BLOCKING WEST ADAMS STREET AND REFUSING TO DISPERSE.  THE CROWD CONTINUALLY LOOPED THROUGH THE DOWNTOWN AREA AND WHILE ON WEST WASHINGTON STREET, IN FRONT OF PO-LICE HEADQUARTERS, THEY BEGAN THROWING INCENDIARY DEVICES, INCLUDING FIREWORKS, AT THE LINE OF POLICE OFFICERS WEARING PHOENIX POLICE TACTICAL UNIFORMS AND GEAR.THE CROWD WOULD DISPERSE TEMPORARILY WHEN MET WITH LESS LETHAL MUNITIONS. HOWEVER THEY CONTIN-UED LOOPING THROUGHOUT THE DOWNTOWN AREA, LIGHTING SMALL FIRES, THROWING BOTTLES AND ROCKS AT OFFICERS AND DAMAGING WINDOWS AND SPRAY PAINTING MULTIPLE BUILDINGS, ROADWAYS AND SIDEWALKS.  AT APPROXIMATELY 2243 HOURS LIEUTENANT MOORE 6803 DECLARED THE GATH-ERING TO BE A RIOT OVER THE POLICE RADIO.  THE CROWD WAS REPEATEDLY ORDERED TO DISPERSE HOWEVER THEY RE-FUSED, TAKING OVER MULTIPLE STREETS AND CONTINUING TO LOOP THROUGHOUT THE DOWNTOWN AREA WHILE ALSO CON-TINUING TO THROW INCENDIARY DEVICES AT OFFICERS AND DAMAGE PROPERTY.  THE RIOT LASTED UNTIL APPROXIM-ATELY 0300 HOURS ONLY ENDING AFTER NUMEROUS ARRESTS WERE MADE.

## CLASS ALLEGATIONS

64.     The proposed class is the 124 individuals who were arrested in downtown Phoenix by PPD on the evening of May 30, 2020/morning of May 31, 2020, and who were charged with felony rioting with the following cut-and-paste probable cause statement:

65.     The class, in accordance with Fed. R. Civ. P.. 23(a):

    a.  Is so numerous that joinder of all members is impracticable.  The believed members of the proposed class are: (1) Brandon James Adler; (2) Lorenzo Ray Alsidez; (3) Alexander Anderson; (4) Luis Alonso Arreola Martinez; (5) Talleah Alvarado; (6) Elizabeth Alvarez;  (7) Shelby Nicole Bay; (8) Trerina Marie Benavides; (9) Darnetta Annette Box; (10) Chari Ollie Monae Brooks; (11) David Bustamante); (12) Gavin Canez; (13) Martin Chavez; (14) Zachary Coleman; (15) Tierra Colter; (16) Korin Amaris Cook; (17) Fabian Cordova; (18) Richard Anthony Cordova; (19) Roberto Cortes; (20) Johan Montes Cuevas; (21) Kristopher Cutshall; (22) Osama Daood; (23) Erick George Deyden; (24) Desirai Dixson; (25) Tyson Anthony Dubrey; (26) Gregory Ellis; (27) Abigail Estrada-Garcia; (28) Griffin Fletcher; (29) Enixe Flores; (30) Kaitlin Galvan; (31) Corina Garcia; (32) Andrew Charles Givens; (33) Victoria Lilianna Gonzalez; (34) Samantha Graening; (35) Mitchell Grave; (36) Maxima Guerrero Sanchez;  (37) Shane Haisten; (38) Marrisa Marie Hand; (39) Anthony Harding; (40) Phillip James Harris; (41) Abel M Hernandez; (42) Jeannette Hunt; (43) Jonathan Hursh; (44) Latanjra Jackson; (45) Jalya Lanae Jefferson; (46) Burandin Rone Johnson; (47)

Johnathan Raymond Kantner; (48) Theresa Nicole Kenny; (49) Robert John Kunz; (50) Michael Jerome Lane; (51) Simon Anthony Lee; (52) Brandon LeMar; (53) Jessie Lepique; (54) Vongel Alexis Lewis; (55) Fernando Lopez; (56) Jessie Ray Luna-Espinoza; (57) Richard Oliver Lyons; (58) Toby Manvelito; (59) Alejandro Adam Marquez; (60) Erika Marie Martin; (61) Charlinda Martinez; (62) Ricky Martinez; (63) Victor Martinez; (64) Kymberli Bryana Mayberry; (65) Christopher McAnallen; (66) Marvin Clayton McClain; (67) Sierra McMartin; (68) Andre James McQueen; (69) Jason Alexander Mendez; (70) Alejandro Meraz; (71) David Yiannis Mihail; (72) Brian Daniel Miranda; (73) William Douglas Molony; (74) David James Montes; (75) Dejon D Moore; (76) Jordan Joseph Moore; (77) Filiangel Morales; (78) Malik Morris; (79) Eddie Munoz; (80) Santiago Jesus Munoz; (81) Marco Nevarez; (82) Darric Newman; (83) Corey Niass; (84) Sheila Nunez; (85) Alexis Nicole Ochoa; (86) Alejandra Ivette Parra; (87) Jesus Manuel Oronoa-Prieto; (88) Daniel Luis Ortega; (89) Shawn Peaks; (90) Jose Pena; (91) Jeremiah David Peralta; (92) Jacob David Pfeifer; (93) Lacroix Dwight Pierce; (94) Joshua Plaza; (95) Harry Andrew Propp; (96) Eduardo Ramirez; (97) Vera Lashell Reed; (98) Tj Roark; (99) Alyssa Monae Ruiz; (100) Ryan Alan Russell; (101) Ludanga Ramsey ("Remby") Sebastian; (102) Williams Shaban; (103) Nikeya Ishaya Simmons; (104) Cristian Soria; (105) Dylan Southworth; (106) Avery Trey Stannard; (107) Bailey Aleandra Stocker; (108) Adam Stone; (109) Jordan Thomas; (110) Angela Tierney; (111) Daniel Christopher Tineo; (112) Pamela Tuakalau; (113) Arxyena

Valurosa-Meaney; (114) Kristina Lee Vanaken; (115) Melodie Vanek; (116) Raquel Anaya Vargas; (117) Taconya Shanette Vaughn; (118) Connor Jacob Wanamaker; (119) Brody Jon Wass; (120) Stanley David West; (121) Ajani Williams; (122) Stanson Ben Yellowman; (123) Brittany Young; and (124) Emmalee Zenko.

b. The claims of the class members have common questions of law and fact related to First Amendment retaliation and unlawful arrest and conspiracy under Federal law, and intentional infliction of emotional distress, conspiracy, aiding and abetting, false light, defamation, and gross negligence claims under Arizona law.

    i.  Specifically, the questions of law are that;

        1.  Whether participating or being in close physical proximity to others who are participating in a peaceful protest is protected activity under the First Amendment;

        2.  Whether participating or being in close physical proximity to others who are participating in a peaceful protest provides sufficient probable cause to arrest and/or detain and/or charge "felony rioting";

        3.  Whether a duty and responsibility of care exists for the Defendants in the manner in which they perform their law enforcement functions related to the use of force, the manner in which individuals are detained, and the investigation and charging of persons with the commission of "felony rioting";

4. Whether placing numerous strangers into poorly ventilated vehicles for hours in the late May Arizona heat without access to water or restrooms breaches the duty and responsibility of care for the Defendants in the manner in which they detain individuals;

5. Whether the indiscriminate charging of individuals for felony rioting by using a cut-and-paste probable cause statement, irrespective of what actions they were actually doing at the time and/or leading up to the time of their arrest breaches the duty and responsibility of care for the Defendants in the manner in which they perform their law enforcement functions related to the investigation and charging of persons with the commission of "felony rioting."

ii. Specifically, the questions of fact are that:

1. Whether individuals were in downtown Phoenix participating in or in close physical proximity to peaceful protestors on the evening and into the morning of May 30, 2020 into May 31, 2020;

2. Whether PPD used indiscriminate force on May 30, 2020- May 31, 2020 in downtown Phoenix and the authorization for such force to be used at that date and time and in that manner;

3. Whether PPD conspired or was otherwise ordered to arrest and charge everyone who was in downtown Phoenix

participating in or in close physical proximity to peaceful protestors on the evening and into the morning of May 30, 2020 into May 31, 2020 for felony rioting as a method by which to ensure they would be taken to jail, and the reasons for that conspiracy and/or order;

4. The identity of the police vehicles used to detain people for hours, and the use of those vehicles on May 30, 2020-May 31, 2020 in downtown Phoenix related to ventilation;

5. Whether those people that were detained in police vehicles for hours on May 30, 2020-May 31, 2020 had access to basic necessities including but not limited to water and/or restroom and/or medical care

iii. The claims of the representative Plaintiffs are typical of the class they represent. Each representative Plaintiff was in downtown Phoenix, Arizona on the evening of May 30, 2020/morning of May 31, 2020. Because each representative Plaintiff was in that location on that date and timeframe and were actually or perceived to be protesters/demonstrators, each representative Plaintiff was arrested by the police and sent to jail for "felony rioting." The probable cause statement used to justify the arrest of each representative Plaintiff was the same cut-and-paste probable cause statement used against 123 other individuals who were in downtown Phoenix, Arizona on the evening of May 30, 2020. All 124 individuals had their criminal cases

dismissed at their Initial Appearances.

    iv.  Each representative Plaintiff has the same interests and suffered from the same type of legal injuries as the rest of the representative Plaintiffs, as well as the proposed class.

    v.  The representative Plaintiffs will fairly and adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

    vi.  The prosecutions of separate actions by individual class members would create a risk that inconsistent and varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

    vii.  The prosecutions of separate actions by individual class members would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

    viii.  The questions of law or fact common to the members of the class predominate over any questions affecting only individual members on the topic of liability.

    ix.  This liability class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe and thereon allege that most members of the class will not be able to find counsel to represent them.

x.  Plaintiffs are informed and believe and thereon allege that it is desirable to concentrate all litigation in one forum because all the claims arise in the same location, date, and time—downtown Phoenix on the evening of May 30, 2020 or early morning of May 31, 2020— and it will promote judicial efficiency to resolve the common questions of law and fact in one forum, rather than in multiple courts.

66.  The first sub-class, in accordance with Fed. R. Civ. P. 23(a):

a.  Is so numerous that joinder of all members is impracticable. While the first sub-class size is currently unknown, upon information and belief, is more than forty (40) individuals.

b.  In addition to the First Amendment Retaliation and unlawful arrest allegations, the claims of the first sub-class members have common questions of fact related to suppression of free speech because they were victims of suppression of free speech and association, because they were actively and peacefully exercising their First Amendment rights by attending protests in downtown Phoenix, Arizona. None of the proposed members of this sub-class caused or participated in violent acts or engaged in illegal activity.

i.  Specifically, the questions of fact are that;

1.  Whether individuals were in downtown Phoenix participating in peace protests on the evening and/or into the morning of May 30, 2020 into May 31, 2020

2. Whether actively and peacefully exercising their First Amendment rights was chilled or otherwise stopped due to PPD's threatened and/or actual indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets

c. The representative Plaintiffs of the first sub-class are Talleah Alvarado, Alexander Anderson, Tierra Colter, Shane Haisten, Anthony Harding, Sierra McMartin, Corey Niass, Dylan Southworth, Jordan Thomas, and Emmalee Zenko.

d. The claims of the representative Plaintiffs of the first sub-class are typical of the sub-class they represent. Each representative Plaintiff was in downtown Phoenix, Arizona on the evening of May 30, 2020/morning of May 31, 2020 peacefully participating in a peaceful protest. Because each representative Plaintiff was in that location on that date and timeframe, each representative Plaintiff was subjected to and/or witnessed PPD's use of force, and because of such force, tried to leave the area without fulfilling their First Amendment mission.

e. Each representative Plaintiff of the first sub-class has the same interests and suffered from the same type of legal injuries as the rest of the proposed sub-class.

f. The representative Plaintiffs of the first sub-class will fairly and adequately protect the interests of the sub-class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the proposed sub-class.

g. The prosecutions of separate actions by individual sub-class members would create a risk that inconsistent and varying adjudications with respect to individual members of the sub-class would establish incompatible standards of conduct for the parties opposing the sub-class.

h. The prosecutions of separate actions by individual sub-class members would, as a practical matter, substantially impair or impede the interests of the other members of the class and other sub-classes to protect their interests.

i. The questions of law or fact common to the members of the sub-class predominate over any questions affecting only individual members of the sub-class on the topic of liability.

j. This liability class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe and thereon allege that most members of the sub-class will not be able to find counsel to represent them.

k. Plaintiffs are informed and believe and thereon allege that it is desirable to concentrate all litigation in one forum because all the claims arise in the same location, date, and time—downtown Phoenix on the evening of May 30, 2020 or early morning of May 31, 2020—and it will promote judicial efficiency to resolve the common questions of law and fact in one forum, rather than in multiple courts.

67.    The second proposed sub-class in accordance with Fed. R. Civ. P. 23(a):

    a.    Is are so numerous that joinder of all members is impracticable. While the second sub-class size is currently unknown, upon information and belief, is more than forty (40) individuals.

    b.    In addition to the First Amendment Retaliation and unlawful arrest allegations, the claims of the second sub-class members have common questions of law and fact related to excessive force under Federal law <u>or</u> gross negligence under Arizona law because they were (a) unlawfully dispersed using tear gas and/or pepper-spray and/or pepper-balls, and/or mace and/or other chemical agents and/or rubber bullets and/or beanbag rounds; and/or or (b) were unlawfully held at weapon point.  None of the proposed members of this sub-class used forced against PPD officers or other demonstrators or threatened to use force against PPD officers or other demonstrators.

       i.    Specifically, the questions of law are that:

          1.    Whether a duty and responsibility of care exists for the Defendants in the manner in which they perform their law enforcement functions related to the use of force;

          2.    Whether PPD used indiscriminate force on May 30, 2020-May 31, 2020 in downtown Phoenix and the authorization for such force to be used at that date and time and in that manner;

          3.    Whether the indiscriminate use of tear gas and/or pepper spray and/or pepper balls and/or rubber bullets to mass target

1        peaceful protesters breaches the duty and responsibility of

2        care for the Defendants in the manner in which they perform

3        their law enforcement functions related to the use of force;

4        4.   Whether the indiscriminate use of tear gas and/or pepper

5             spray and/or pepper balls and/or rubber bullets to target a

6             small number of people within a much larger group breaches

7             the duty and responsibility of care for the Defendants in the

8             manner in which they perform their law enforcement

9             functions related to the use of force;

10   ii.   Specifically, the questions of fact are that;

11        1.   Whether individuals were in downtown Phoenix on the

12             evening and/or into the morning of May 30, 2020 into May

13             31, 2020;

14        2.   Whether individuals were impacted or affected by PPD's

15             indiscriminate use of tear gas and/or pepper spray and/or

16             pepper balls and/or rubber bullets.

17   c.   The representative Plaintiffs of the second sub-class are Talleah Alvarado,

18        Alexander Anderson, Tierra Colter, Maxima Guerrero Sanchez, Shane

19        Haisten, Anthony Harding, Brandon LeMar, Erika Martin, Charlinda

20        Martinez, Victor Martinez, Sierra McMartin, Corey Niass, Darric Newman,

21        Dylan Southworth, Jordan Thomas, Angela Tierney, Melanie Vanek, Ajani

22        Williams, and Emmalee Zenko.

23

d. The claims of the representative Plaintiffs of the second sub-class are typical of the sub-class they represent. Each representative Plaintiff was in downtown Phoenix Arizona on the evening of May 30, 2020/morning of May 31, 2020. Because each representative Plaintiff was in that location on that date and timeframe, each representative Plaintiff was subjected to PPD's use of force, and because of such force, were injured.

e. Each representative Plaintiff of the second sub-class has the same interests and suffered from the same type of legal injuries as the rest of the proposed second sub-class.

f. The representative Plaintiffs of the second sub-class will fairly and adequately protect the interests of the second sub-class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the proposed second sub-class.

g. The prosecutions of separate actions by individual second sub-class members would create a risk that inconsistent and varying adjudications with respect to individual members of the second sub-class would establish incompatible standards of conduct for the parties opposing the second sub-class.

h. The prosecutions of separate actions by individual second sub-class members would, as a practical matter, substantially impair or impede the interests of the other members of the class and other sub-classes to protect their interests.

    i.   The questions of law or fact common to the members of the second sub-class predominate over any questions affecting only individual members of the second sub-class on the topic of liability.

    j.   This liability class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe and thereon allege that most members of the second sub-class will not be able to find counsel to represent them.

    k.   Plaintiffs are informed and believe and thereon allege that it is desirable to concentrate all litigation in one forum because all the claims arise in the same location, date, and time—downtown Phoenix on the evening of May 30, 2020 or early morning of May 31, 2020—and it will promote judicial efficiency to resolve the common questions of law and fact in one forum, rather than in multiple courts.

68.   The third proposed sub-class in accordance with Fed. R. Civ. P. 23(a):

    a.   Is are so numerous that joinder of all members is impracticable. While the third sub-class size is currently unknown, upon information and belief, is more than forty (40) individuals.

    b.   In addition to the First Amendment Retaliation and unlawful arrest allegations, the claims of the third sub-class members have common questions of law and fact related to their conditions of confinement in that they were held for hours in poorly ventilated police vehicles without access to basic necessities as water, restrooms, or medical care.

       i.  Specifically, the questions of law are that:

           1.  Whether a duty and responsibility of care exists for the Defendants in the manner in which they perform their law enforcement functions related to the detention of individuals.

           2.  Whether the detention of individuals in poorly ventilated police vehicles without access to necessities such as water, restrooms, or medical care breaches the duty and responsibility of care for the Defendants in the manner in which they perform their law enforcement functions related to the detention of individuals.

       ii.  Specifically, the questions of fact are that;

           1.  Whether individuals were detained in poorly ventilated police vehicles for hours without water, restrooms, or medical care in the late May Arizona heat.

           2.  The claims of the representative Plaintiffs of the third sub-class are typical of the sub-class they represent. Each representative Plaintiff was detained in poorly ventilated police vehicles for hours without water, restrooms, or medical care in the late May Arizona heat.

    c.  The representative Plaintiffs of the third sub-class are Tierra Colter, Corina Garcia, Maxima Guerrero Sanchez, Jeanette Hunt, Latanjra Jackson, Charlinda Martinez, Sierra McMartin, Jordan Thomas, Angela Tierney, and Melanie Vanek.

d. Each representative Plaintiff of the third sub-class has the same interests and suffered from the same type of legal injuries as the rest of the proposed third sub-class.

e. The representative Plaintiffs of the third sub-class will fairly and adequately protect the interests of the third sub-class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the proposed third sub-class.

f. The prosecutions of separate actions by individual third sub-class members would create a risk that inconsistent and varying adjudications with respect to individual members of the third sub-class would establish incompatible standards of conduct for the parties opposing the third sub-class.

g. The prosecutions of separate actions by individual third sub-class members would, as a practical matter, substantially impair or impede the interests of the other members of the class and other sub-classes to protect their interests.

h. The questions of law or fact common to the members of the third sub-class predominate over any questions affecting only individual members of the third sub-class on the topic of liability.

i. This liability class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe and thereon allege that most members of the third sub-class will not be able to find counsel to represent them.

j.    Plaintiffs are informed and believe and thereon allege that it is desirable to concentrate all litigation in one forum because all the claims arise in the same location, date, and time—downtown Phoenix on the evening of May 30, 2020 or early morning of May 31, 2020—and it will promote judicial efficiency to resolve the common questions of law and fact in one forum, rather than in multiple courts.

69.    In accordance with Federal Rule of Civil Procedure 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who are identified through this limited discovery. Plaintiffs contemplate notice through mail to class members at the addresses publicly available through the arrest and booking records, motor vehicle data or "skip tracing," and through "hotlines" devoted to reaching such class members by availably listed phone data, if necessary.   Plaintiffs contemplate the class notice will inform class members of the following:

a.    The pendency of the class action, and the issues common to the class;

b.    The nature of the action;

c.    Their right to "opt out" of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

d.    Their right, if they do not "opt out," to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named Plaintiffs and their counsel; and

e.    Their right, if they do "opt out," to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common

issues, adverse to the class.

70.     Plaintiffs are represented by counsel with extensive class-action experience in civil rights cases.  Collectively, Attorneys Murphy, Ruff, and Harris have successfully litigated a number of civil rights and/or class actions that have resulted in multi-million-dollar settlements.  Attorneys Benedetto, Hamel, and Knight have litigated volumes of civils rights actions in the United States District Court for the District of Arizona.

71.     As a result of the above-described conduct by the Defendants, Plaintiffs and class members have been denied their constitutional rights.  Defendants' policies, practices, conduct, and acts alleged herein have resulted in irreparable injury to Plaintiffs.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 –Unlawful Retaliation in Violation of the First Amendment
### (Against all Defendants and Officers to be Named)

72.     All other paragraphs of this lawsuit are incorporated.

73.     42 U.S.C section 1983 provides, in relevant part, as follows:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory of the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

42 U.S.C. § 1983.

74.     Plaintiffs are citizens or residents of the United States with the rights to redress under section 1983.

75.     Defendants Jeri Williams, Dennis Orender, Benjamin Moore, Douglas McBride, and the unknown officers (collectively, the "PPD Defendants") involved in the

excessive use of force against Plaintiffs, are "persons" as that term is defined by 42 U.S.C. § 1983.

76.     The PPD Defendants were, at all times relevant hereto, acting under the color of law in their capacities as the City of Phoenix Police Department employees; their acts and omissions, were conducted within the scope of their official duties or employment.

77.     The PPD Defendants, as the decision-makers for both PPD and the Tactical Response Unit (the PPD unit that responded to the May 30, 2020 protests) undoubtedly were aware of and authorized the PPD officers' use of force at the protests on May 30, 2020.  They also were aware of and authorized PPD officers' plan to arrest all actual and perceived protesters in the downtown Phoenix area, and charge them with felony rioting using the same cut-and-paste probable cause statement.

78.     The PPD Defendants and currently unknown officers deprived Plaintiffs of the right to protest peacefully.  The PPD Defendants and currently unknown officers have done so through, among other things, the excessive use of force, unwarranted seizures and detentions, including unlawfully arresting individuals, and holding them in hot vans for hours without access to water or a restroom.

79.     PPD's past history and subsequent similar misconduct indicates that such conduct is intentional and the PPD Defendants and/or currently unknown officers were motivated, in part, by the desire to silence and disrupt Plaintiffs' actual or perceived protected anti-police-violence views.

80.     This unlawful behavior has prevented, deterred, or chilled Plaintiffs' willingness to exercise their First Amendment right entitling Plaintiffs to compensatory, economic, consequential and special damages in an amount to be determined at trial.

81.     Plaintiffs are further entitled to his attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

82.     Finally, in addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages against Defendants under 42 U.S.C. § 1983, in that the actions of the Defendants and/or 2currently unknown officers were taken maliciously, willfully, or with a reckless disregard of Plaintiffs' constitutional rights. Such damages would have to be determined individually, following establishing liability through this class action.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Malicious arrest and institution of criminal proceedings in Violation of the Fourth Amendment**
**(Against All Defendants and Officers To Be Named)**

83.     All other paragraphs of this lawsuit are incorporated.

84.     42 U.S.C section 1983 provides, in relevant part, as follows:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory of the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

42 U.S.C. § 1983.

85.     Plaintiffs are citizens or residents of the United States with the rights to redress under section 1983.

86.     Defendants Jeri Williams, Dennis Orender, Benjamin Moore, Douglas McBride, (collectively, the "PPD Defendants"), and the currently unknown officers involved in the excessive use of force against Plaintiffs, are "persons" as that term is

1 defined by 42 U.S.C. § 1983.

2      87.    The PPD Defendants and currently unknown officers were, at all times

3 relevant hereto, acting under the color of law in their capacities as the City of Phoenix

4 Police Department employees; their acts and omissions, were conducted within the scope

5 of their official duties or employment.

6      88.    The mass arrests of 124 individuals, and the use of a cut-and-paste probable

7 cause statement to support all 124 arrests required mass coordination amongst hundreds of

8 PPD officers.  This coordination likely required approval by PPD decision-makers,

9 including approval of the tactic/strategy to conduct mass arrests, and approval of the cut-

10 and-paste probable cause statement and circulation amongst on-duty PPD officers.

11      89.    The PPD Defendants, as the decision-makers for both PPD and the Tactical

12 Response Unit (the PPD unit that responded to the May 30, 2020 protests) undoubtedly

13 were aware of and authorized the PPD officers' plans to "round up" protesters, or perceived

14 protesters, on May 30, 2020, to charge them with a felony, and support their arrests and

15 charges using the identical cut-and-paste probable cause statement.

16      90.    At the time of the complained-of events, the Fourth Amendment to the

17 United States Constitution clearly established Plaintiff's right to be secure in his person

18 from unreasonable seizure through an arrest unsupported by probable cause (an "unlawful

19 arrest").

20      91.    At the time of the complained-of events, any reasonable police officer would

21 have known that the Constitution clearly establishes the right of American citizens to be

22 secure in their persons from unreasonable seizure through an unlawful arrest.

23

92.     Objectively reasonable police officers in the position of the PPD Defendants and/or currently unknown officers would not have caused Plaintiffs to be arrested for felony rioting because probable cause did not exist to arrest Plaintiffs  and Plaintiffs had committed or were committing any crime at the time of their arrest.

93.     The actions of the PPD Defendants and/or currently unknown officers, as described herein, were malicious and/or involved reckless, callous, and deliberate indifference to Plaintiffs' federally protected rights, including but not limited to their First and Fourth Amendment rights.

94.     The actions of the PPD Defendants and/or currently unknown officers were moving forces behind Plaintiffs' injuries, intentionally depriving them of their constitutional rights and causing them other damages.

95.     The PPD Defendants and/or currently unknown officers are not entitled to qualified immunity for the conduct complained of in this Complaint because no reasonable officer could believe that the actions described in this lawsuit were objectively reasonable.

96.     As a proximate result of the actions of the PPD Defendants and/or currently unknown officers unlawful and unconstitutional conduct, Plaintiff suffered injuries and other damages and losses as described herein entitling Plaintiffs to compensatory, economic, consequential and special damages in an amount to be determined at trial.

97.     Plaintiffs are further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

98.     Finally, in addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages against Defendants under 42 U.S.C. §

1983, in that the actions of the Defendants and/or currently unknown officers were taken

maliciously, willfully, or with a reckless disregard of Plaintiffs' constitutional rights.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Excessive Force in Violation of the Fourth Amendment**
**(Against all Defendants and Officers To Be Named)**

99.     All other paragraphs of this lawsuit are incorporated.

100.    42 U.S.C section 1983 provides, in relevant part, as follows:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory of the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

42 U.S.C. § 1983.

101.    Plaintiffs are citizens or residents of the United States with the rights to

redress under section 1983.

102.    Defendants Jeri Williams, Dennis Orender, Benjamin Moore, Douglas

McBride, (collectively, the "PPD Defendants"), and the currently unknown officers

involved in the excessive use of force against Plaintiffs, are "persons" as that term is

defined by 42 U.S.C. § 1983.

103.    The PPD Defendants and currently unknown officers were, at all times

relevant hereto, acting under the color of law in their capacities as the City of Phoenix

Police Department employees; their acts and omissions, were conducted within the scope

of their official duties or employment.

104.    The PPD Defendants, as the decision-makers for both PPD and the Tactical

Response Unit (the PPD unit that responded to the May 30, 2020 protests) were aware of

and authorized the PPD officers' use of force at the protests on May 30, 2020.

105.    At the time of the complained-of events, the Fourth Amendment to the United States Constitution clearly established Plaintiffs' right to be secure in his person from unreasonable seizure through excessive force.

106.    At the time of the complained-of events, any reasonable police officer would have known that the Constitution clearly establishes the right of American citizens to be secure in their persons from unreasonable seizure through excessive force.

107.    Defendants' actions and use of force – including but not limited to their unnecessary deployment of tear gas, pepper balls, pepper-spray, mace, rubber-coated bullets, and beanbag rounds – were objectively unreasonable in light of the facts and circumstances confronting them and violated Plaintiffs' rights.

108.    Defendants' actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiffs' federally protected rights.

109.    Defendants engaged in the above-described conduct willfully, maliciously, in bad faith, with willful indifference to and in reckless disregard of Plaintiffs' federally protected constitutional rights, and with conscious awareness that they would cause Plaintiffs to suffer physical, emotional, and psychological injuries.

110.    Defendants' acts and/or omissions were moving forces behind Plaintiffs' injuries, causing them to experience physical injuries, physical pain, anxiety, humiliation, and/or emotional distress.  And each of the Plaintiffs have incurred and will incur in the future, medical and related expenses, past and future lost earnings, loss of property, and/or compensatory, economic, consequential, special and general damages in an amount to be

proven at trial.

111.    Defendants are not entitled to qualified immunity for the conduct complained of in this Complaint because no reasonable officer could believe that the actions described in this lawsuit were objectively reasonable.

112.    Plaintiffs are further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

113.    In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages against the individual Defendants under 42 U.S.C. § 1983, in that the actions of these Defendants were taken maliciously, willfully, or with a reckless disregard of Plaintiffs' constitutional rights.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Municipal Liability under *Monell***
**(Against City of Phoenix Only)**

114.    All other paragraphs of this lawsuit are incorporated.

115.    Municipal bodies are liable for constitutional violations under 42 U.S.C. § 1983 when execution of its official policy or custom deprives an individual of its rights protected by the Constitution.

116.    Such municipal liability exists when a city fails to properly train, supervise, or discipline its employees, amounting to a deliberate indifference to a plaintiff's constitutional rights.

117.    The Phoenix Police Department has a custom or practice of unlawfully deploying chemical and kinetic weapons to illegally disperse and disrupt non-violent protests.  In fact, over the past five years, PPD has been subject to multiple excessive force

lawsuits, including an additional class action, brought by protesters.

118.   The Phoenix Police Department has a custom or practice of unlawfully arresting and maliciously prosecuting protesters based upon their anti-police violence beliefs, or perceived anti-police violence beliefs.  In fact, over the past five years, PPD has been subject to multiple lawsuits, brought by protesters claiming unlawful arrest and malicious prosecution.

119.   More, the mass arrests of 124 individuals, and the use of a cut-and-paste probable cause statement required mass coordination amongst hundreds of PPD officers. This coordination likely required approval by PPD decision-makers, including approval of the tactic/strategy to conduct mass arrests, and approval of the cut-and-paste probable cause statement and circulation amongst on-duty PPD officers.

120.   The PPD Defendants, as the decision-makers for both PPD and the Tactical Response Unit (the PPD unit that responded to the May 30, 2020 protests) were aware of and authorized the PPD officers' plans to use force against protesters; "round up" protesters, or perceived protesters on May 30, 2020, to charge them with a felony; and support their arrests and charges using the identical cut-and-paste probable cause statement.

### Defendant City of Phoenix Ratified the Illegal Policies, Procedures, and Practices Utilized by PPD at the May 30, 2020 Protests

121.   The City of Phoenix has vested final decision-making authority in its Chief of Police, Defendant Jeri Williams, in the area of law enforcement and setting and implementing the policies and practices of the PPD, including but not limited to the development, implementation, and/or ratification of the PPD's procedures, policies,

regulations, practices, and/or customs related to its use of force in response to political protests, the handling of large political protests, demonstrations, and marches, and the use of chemical and kinetic weapons against civilians.

122.   On May 30, 2020, PPD officers engaged in an inordinate and indiscriminate use of force, unnecessarily injuring hundreds of people attempting to express their views, and they did not without provocation, justification, or warnings.  Worse, the types of weapons used against non-violent demonstrators—largely chemical weapons—forced individuals to remove their masks and cough and sneeze on one another during a global pandemic spread through respiratory droplets.

123.   On May 30, 2020, PPD officers also conducted mass arrests in the downtown Phoenix area.  They arrested anyone who was on the street or in vehicles, whether they had attended a protest or not.  To support these mass arrests and cause individuals to be booked into jail, PPD officers used identical, and illegal, cut-and-paste probable cause statements.

124.   Immediately following this violent display of force and gross abuse of power, the procedures and violence used by PPD were ratified by Chief Williams who praised her officers' conduct during these protests and who refused to discipline any officers involved in these illegal activities.

125.   In a statement to the press about these arrests, Chief Williams said:  "[A]t the end of the day, I do know that my officers were functioning under justice, under trying to protect public safety, because our number one priority is safety.  So you're talking about pulling people out of cars . . . those cars were used to help fortify and give guns, knives . . . . I'm sorry, rocks and bottles, water, food, to those individuals who were absolutely there to commit crimes."

126.     Afterwards, the City awarded PPD with millions of dollars in overtime for responding to these protests.

127.     These endorsements of police misconduct had the intended impact:  PPD failed to change its behavior, and instead continued to unlawfully arrest and maliciously prosecute Black Lives Matter protesters.

128.     In other words, the policies, patterns, practices, and/or customs of condoned misconduct are tacitly or overtly sanctioned by the City of Phoenix, as evidenced by the PPD's own history of similar misconduct; the conduct of the PPD Defendants both during and in the aftermath of May 30, 2020; the statements made by City leadership; and PPD's continued misconduct.  These policies, patterns, practices, and/or customs, violate the constitutional rights of Plaintiffs and others in Plaintiffs' situation.

129.     As a direct and proximate result of these actions and failures, Plaintiffs were injured and suffered damages in an amount to be proven at individual damages trials.

***As a Matter of Policy, Practice, and Custom, Defendant City of Phoenix and the PPD Defendants Failed to Adequately Train PPD Officers in Lawful Crowd Control Techniques and Proper Arrests***

130.     The City of Phoenix has vested final decision-making authority in its Chief of Police, Defendant Jeri Williams, in the area of law enforcement and setting and implementing the policies and practices of the PPD, including but not limited to the development, implementation, and/or ratification of the PPD's procedures, policies, regulations, practices, and/or customs related to its use of force in response to political protests, the handling of large political protests, demonstrations, and marches, and the use of chemical and kinetic weapons against civilians.

131.    Defendant Williams and her delegated command staff, including the PPD Defendants in charge of supervising and/or managing the Tactical Response Unit, were aware that the unlawful use of dangerous weapons in violent and unlawful ways to break up peaceful associations and speech is a regular custom and practice of PPD personnel. Indeed, many of the PPD Defendants have been named in multiple lawsuits making similar claims.

132.    Defendant Williams and her delegated command staff, including the PPD Defendants in charge of supervising and/or managing the Tactical Response Unit, were aware that PPD personnel would unlawfully arrest protesters as a way to disrupt and discourage peaceful associations and speech; particularly speech critical of either PPD or police in general. Indeed, many of the PPD Defendants have been named in multiple lawsuits making similar claims, and this regular practice is now the subject of three independent internal investigations in the City of Phoenix.

133.    Because of PPD's prior history of misconduct at protests, it was critical to take all steps necessary to ensure that official policy was changed and that officers were trained in a manner sufficient to address the well-known, constitutionally deficient practices and customs that violate individuals' First and Fourth Amendment rights.

134.    Defendant City and the PPD Defendants have known of the deficiencies in PPD policies and training since at least 2010.  Despite the long history of unlawful PPD conduct at First Amendment assemblies and demonstrations, and the longstanding deficiencies in the training of PPD line and command staff on proper law enforcement conduct, the City failed to adequately train its officers and command staff prior to May 30, 2020 protests in the rights of demonstrators, lawful crowd control, dispersal orders,

separating those engaged in lawful conduct from those engaged in unlawful conduct, the permissible use of "less-than-lethal" weapons during demonstrations, the permissible use of force in such situations, and lawful arrests. This failure amounted to deliberate indifference to the rights of persons with whom PPD come into contact.

## FIFTH CLAIM FOR RELIEF
### Civil Conspiracy under Arizona Law
### (Against Defendant City of Phoenix Only)

135.    All other paragraphs of this lawsuit are incorporated.

136.    As set forth herein, employees of the Defendant City of Phoenix, including the PPD Defendants and currently unknown officers, agreed and/or conspired to commit the tort of false arrest of hundreds of individuals, including Plaintiffs on the evening of May 30, 2020 / early morning of May 31, 2020.

137.    As set forth herein, employees of the Defendant City of Phoenix, including the PPD Defendants and currently unknown officers agreed and/or conspired to commit the tort of false arrest through unlawful means, namely the use of a manufactured, cut-and-paste probable cause statement to support false felony charges against the 124 arrested individuals.

138.    The mass arrests of 124 individuals, and the use of a manufactured, cut-and-paste probable cause statement to support false felony charges against these individuals required mass coordination amongst hundreds of PPD officers. This coordination required approval the PPD Defendants, including approval of the tactic/strategy to conduct mass arrests, and approval of the cut-and-paste probable cause statement and circulation amongst on-duty PPD officers.

139.    As a direct and proximate cause of this conspiracy, Plaintiffs were injured and suffered other damages in an amount to be proven at individual damages trials.

140.    As set forth above, the PPD Defendants and currently unknown officers engaged in this conspiracy were acting in the course and scope of their employment as employees of the City of Phoenix, and the City of Phoenix is therefore vicariously liable for the damages caused by their conspiracy to engage in tortious conduct.

## SIXTH CLAIM FOR RELIEF
### Aiding & Abetting Under Arizona Law
### (Against Defendant City of Phoenix Only)

141.    All other paragraphs of this lawsuit are incorporated.

142.    As set forth herein, employees of the Defendant City of Phoenix, including the PPD Defendants and currently unknown officers, were aware of other PPD personnel's plan to commit the tort of false arrest of hundreds of individuals, including Plaintiffs on the evening of May 30, 2020 / early morning of May 31, 2020.

143.    As set forth herein, employees of the Defendant City of Phoenix, including the PPD Defendants and currently unknown officers assisted PPD personnel in said personnel's plan to commit the tort of false arrest through unlawful means, namely the use of a manufactured, cut-and-paste probable cause statement to support false felony charges against the 124 arrested individuals.

144.    The mass arrests of 124 individuals, and the use of a manufactured, cut-and-paste probable cause statement to support false felony charges against these individuals required mass coordination amongst hundreds of PPD officers.  This coordination required the approval of the PPD Defendants, including approval of the tactic/strategy to conduct mass arrests, and approval of the cut-and-paste probable cause statement and circulation

1   amongst on-duty PPD officers.

2      145.   These employees of the Defendant City of Phoenix, including the PPD

3   Defendants knew that the conduct of currently unknown officers – including the mass arrest

4   of individuals and the use of a manufactured cut-and-paste probable cause statement to

5   support the false felony charges of those arrested—constituted the tort of unlawful arrest.

6      146.   These employees of the Defendant City of Phoenix, including the PPD

7   Defendants aided and abetted in the commission of the tort of unlawful arrest by

8   authorizing, approving, acquiescing, directing, and/or directly participating in the tort's

9   commission.

10     147.   As a direct and proximate cause of this misconduct Plaintiffs were injured

11  and suffered other damages in an amount to be proven at individual damages trials.

12     148.   As set forth above, the PPD Defendants and currently unknown officers

13  engaged in this conspiracy were acting in the course and scope of their employment as

14  employees of the City of Phoenix, and the City of Phoenix is therefore vicariously liable

15  for the damages caused by their aiding and abetting of tortious conduct.

16                  **SEVENTH CLAIM FOR RELIEF**
                        **Gross Negligence**
17            **(Against Defendant City of Phoenix Only)**

18     149.   All other paragraphs of this lawsuit are incorporated.

19     150.   As set forth herein, all employees of the Defendant City of Phoenix,

20  including the PPD Defendants, owed Plaintiffs a duty of reasonable care with respect to

21  their safety, physical health, and Constitutional rights.

22     151.   As set forth herein, employees of Defendant City of Phoenix, including the

23  PPD Defendants, failed to properly supervise and train currently unknown officers in the

rights of demonstrators, lawful crowd control, dispersal orders, separating those engaged in lawful conduct from those engaged in unlawful conduct, the permissible use of "less-than-lethal" weapons during demonstrations, the permissible use of force in such situations, and lawful arrests, prior to the May 30, 2020 protests.

152.   The PPD Defendants in charge of supervising and/or managing the Tactical Response Unit, were aware that the unlawful use of dangerous weapons in violent and unlawful ways to break up peaceful associations and speech is a regular custom and practice of PPD personnel. Indeed, many of the PPD Defendants have been named in multiple lawsuits making similar claims.

153.   The PPD Defendants in charge of supervising and/or managing the Tactical Response Unit, were aware that PPD personnel would unlawfully arrest protesters as a way to disrupt and discourage peaceful associations and speech; particularly speech critical of either PPD or police in general. Indeed, many of the PPD Defendants have been named in multiple lawsuits making similar claims, and this regular practice is now the subject of three independent internal investigations in the City of Phoenix.

154.   Despite knowing the above, PPD Defendants failed to train and/or properly supervise currently unknown officers prior to May 30, 2020 protests, and this failure breached their duty of care of Plaintiffs.

155.   As a direct and proximate cause of the PPD Defendants breach of duty, Plaintiffs were injured and suffered other damages in an amount to be proven at individual damages trials.

156.   As set forth above, the PPD Defendants were acting in the course and scope of their employment as employees of the City of Phoenix, and the City of Phoenix is

1  therefore vicariously liable for the damages caused by their tortious conduct.

2  **EIGHTH CLAIM FOR RELIEF**
   **Intentional Infliction of Emotional Distress**
3  **(Against Defendant City of Phoenix Only)**

4  157.   All other paragraphs of this lawsuit are incorporated.

5  158.   As set forth above, employees of Defendant City of Phoenix, acting in the

6  course and scope of their employment, engaged in a series of acts that an average member

7  of the community would regard as atrocious, intolerable in a civilized community, and

8  beyond all possible bounds of decency.  In particular, employees of Defendant City of

9  Phoenix caused Plaintiffs to be unlawfully arrested for a felony they did not commit,

10  detained them for hours, and ultimately caused them to be booked into jail during a global

11  respiratory pandemic.

12  159.   These employees of the City either personally participated in these activities,

13  acted jointly or conspired with others who did so; authorized, acquiesced in, or set in

14  motion policies, plans, or actions that led to the unlawful conduct; failed to take action to

15  prevent such unlawful conduct; failed to maintain adequate training and supervision in

16  deliberate indifference to Plaintiffs' rights; and ratified unlawful conduct that occurred by

17  agents and officers under their direction, supervision, and control, including failing to take

18  remedial or disciplinary action.

19  160.   The aforementioned conduct was intentional insofar as it intended to cause

20  Plaintiffs emotional distress (and discourage them from participating in protected First

21  Amendment activities).

22  161.   The aforementioned conduct was reckless because those engaging in that the

23  employees of the Defendant City of Phoenix were aware of and consciously disregarded

the near certainty that their actions would cause Plaintiffs emotional distress.

162.   The aforementioned conduct did, indeed, cause Plaintiffs to suffer emotional distress.

163.   As a direct and proximate result of these actions, Plaintiffs were injured and suffered damages in an amount to be proven at individual damages trials.

**NINTH CLAIM FOR RELIEF**
**Invasion of Privacy – False Light under Arizona Law**
**(Against Defendant City of Phoenix Only)**

164.   All other paragraphs of this lawsuit are incorporated.

165.   As set forth herein, employees of the Defendant City of Phoenix, acting in the course and scope of their employment, made false and misleading public statements against Plaintiffs – namely that they had committed the crime of felony rioting on or about May 30, 2020.

166.   The statements of these employees of the Defendant City of Phoenix create a false impression about Plaintiffs, namely that they had engaged in violence and participated in a riot.

167.   The impression created about Plaintiffs – that they had engaged in violence and participated in a riot – would be highly offensive to any reasonable person.

168.   The false and misleading statements caused Plaintiffs to be damaged and negatively impacted their community standing, professional reputation, emotional well-being, and mental health.

169.   At the time the false statement was made, employees of the Defendant City of Phoenix either knew the statement would create a false impression of Plaintiffs or acted in reckless disregard of the fact that their statement would create a false impression of

1  Plaintiffs.

2  170.   As set forth above, the PPD Defendants were acting in the course and scope

3  of their employment as employees of the City of Phoenix, and the City of Phoenix is

4  therefore vicariously liable for the damages caused by their tortious conduct.

5  **TENTH CLAIM FOR RELIEF**
   **Defamation Under Arizona Law**

6  **(Against Defendant City of Phoenix Only)**

7  171.   All other paragraphs of this lawsuit are incorporated.

8  172.   As set forth herein, employees of the Defendant City of Phoenix, acting in

9  the course and scope of their employment, made defamatory statements of fact about

10  Plaintiffs – namely that they had committed the crime of felony rioting on or about May

11  30, 2020.

12  173.   This statement was false at the time it was made.

13  174.   The employees of the Defendant City of Phoenix who made this false

14  statement had actual knowledge that this statement was false at the time it was made

15  because it was based upon a manufactured cut-and-paste statement.

16  175.   This false statement was published on each and every Plaintiff's Form IV

17  Probable Cause statement – which is public record.

18  176.   The statement caused Plaintiffs to be damaged and negatively impacted their

19  community standing, reputation, emotional well-being, mental health, and financial

20  stability.

21  177.   At the time the false statement was made, the employees of the Defendant

22  City of Phoenix either knew the statement the false, or they acted in reckless disregard of

23  its falsity.

178. As set forth above, the PPD Defendants were acting in the course and scope of their employment as employees of the City of Phoenix, and the City of Phoenix is therefore vicariously liable for the damages caused by their tortious conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court enter judgment against Defendants as follows:

a. For compensatory damages (general and special) in an amount to compensate Plaintiffs fully and fairly for the violations of their Constitutional Rights;

b. For general, consequential, special, and compensatory damages, including but not limited to their pain and suffering, mental anguish, emotional suffering, and loss of enjoyment of life;

c. For nominal damages as provided for by law;

d. For punitive damages in an amount sufficient to punish defendants and deter them from similar unconstitutional and unlawful conduct in the future;

e. For prejudgment interest on all liquidated sums;

f. For a permanent injunction prohibiting Defendants from using chemical and kinetic weapons and methods of "crowd-control" at protests;

g. For a permanent injunction prohibiting Defendants from engaging in any other unconstitutional behaviors as described herein and order the change of City of Phoenix policies as appropriate to ensure they do not continue to engage in unconstitutional conduct in the future;

h. For a permanent injunction entering a Notation of Clearance under A.R.S. § 13-4051 on behalf of all Plaintiffs;

1        i.   For attorneys' fees under 42 U.S.C. §§ 1983 and 1988;

2        j.   For Plaintiff's costs and other expenses incurred in this action; and

3        k.  Such other and further relief as the Court deems just.

4    DATED this 28th day of May, 2021.

5    THE PEOPLE'S LAW FIRM, PLC
     645 North 4th Avenue, Suite A
6         Phoenix, Arizona  85003

7    By:  /s/ Stephen D. Benedetto
          Stephen D. Benedetto
8             Heather Hamel
          Will Knight

9           *Attorneys for Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23